## LIZZIE KELLY

### v.

## MARY S. BRENNAN et al.

1. The demand by the principal for the return of a written power under which an attorney in fact was acting, and its surrender and withdrawal without any explanatory words or further instructions, must be held to be a revocation of the power.

2. A contract made by the principal agreeing to sell property, the subject-matter of the agency, prevents a subsequent contract for sale made by the agent, though on the same day, from having any force.

On bill, answer and proofs.

This bill is filed by the complainant, Lizzie Kelly, wife of Samuel H. Kelly, against the defendants, Mary S. Brennan and George W. Crosby, for the purpose of compelling the specific performance of a contract claimed by the complainant to have been entered into by the defendant Brennan for the sale of lands in Atlantic City by the action of her agent, David Giltinan. The defendant Crosby is made a party in respect to a contract which he entered into with the defendant Brennan for the purchase of this land.

The written agreement for sale on which the complainant claims is in the words and figures as follows:

"ATLANTIC CITY, N. J., November 23d, 1895.

"Received of Samuel H. Kelly the sum of $250—on account of purchase of property on corner of Pacific and California 175 feet on Pacific—same on Monterey fronting on California. Price of same $20,000. To be paid in cash $5,000. Balance on mortgage $15,000 at 6 %.

"Settlement to be made thirty days after date—said property being now owned by Mary S. Brennan.

"DAVID GILTINAN, Agt. for
"Mary S. Brennan."

The bill claims that Samuel H. Kelly, mentioned in the agreement, was acting, in purchasing the land, for and in behalf of

his wife, the complainant, Lizzie Kelly, and that after the above receipt had been given by Mrs. Brennan's agent the defendant Crosby, being informed of the complainant's purchase, and with the purpose of defrauding her of the benefit of her bargain, made a contract with Mrs. Brennan herself, on the 26th day of November, 1895, with actual notice of the record of the contract of the complainant; that on the 23d day of December, 1895, the complainant made a tender to the defendant Brennan of the balance of the purchase-money and a deed for execution, which she refused to execute, giving as her reason that Crosby had agreed to make a greater cash payment and that Giltinan, who claimed to act as her agent in making the contract to convey to the complainant, did not have the power to make any such contract. The bill prays for answer without oath.

The defendant Mary S. Brennan files her several answer, denying that Giltinan was her agent for the sale of the premises, and denying that he had any authority to sell it, declaring that she had in July, 1895, authorized Giltinan, in writing, to sell the property subject to her approval, and that subsequently, in August, 1895, she revoked even that authority, so that on November 23d, 1895, Giltinan was not her agent and had no authority to sell the property and bind the defendant in any way. She denies that her contract with Crosby was made on the 26th of November, 1895, and says that on November 21st, 1895, she gave to Crosby an option to purchase the lands, to be exercised by him on or before November 25th, 1895; that on November 23d, in the afternoon, the option was exercised by Crosby through his agent, Devine, who then paid the defendant $500, and the defendant then gave him a receipt in the words and figures as follows:

"Rec'd Nov. 23/95.
"From M. A. Devine, $500.00 on acct. of purchase of land Cor. Pac. & Cal. Ave., 175 x 150, as per verbal agreement the price $20,000, ½ cash.
"M. S. BRENNAN."

The defendant further states that on the 25th of November, 1895, and before she had any knowledge of the sale claimed to

Kelly *v.* Brennan.

have been made by Giltinan to the complainant, she entered into the following supplemental agreement with Crosby for the sale of the premises in question, which agreement is in these words:

"Memorandum of sale, owner, Mary S. Brennan. Purchaser Geo. W. Crosby; property northeast corner of Pacific and California Avenues, same being 175 feet on Pacific Avenue 250 feet on California Avenue to Monterey Ave.

"Terms twenty thousand (20,000) dollars, ten thousand ($10,000) dollars to be paid in cash and the balance to remain in mortgage. The owner to furnish a good title to the land through the West Jersey Title & Guarantee Company of Camden, N. J., Devine and Wootton to receive 2 % commission for the amount of the sale. Delivery on or before December 31st, 1895. The above parties do hereby agree to and with their heirs and assigns to abide by said above terms and agreement for time as above, and the said owner hereby acknowledges the receipt of five hundred ($500.00) dollars in payment of above consideration, signed and sealed this 23d day of November, 1895.

"Witness

"N. H. Brennan as to
    "Mary S. Brennan.        MARY S. BRENNAN.  [L. S.]
"M. A. Devine, as to        GEORGE W. CROSBY.  [L. S.]
    "George W. Crosby."

The defendant Crosby files his separate answer and denies that he made his agreement to purchase after having been notified that the complainant had entered into an agreement for a like purchase. He denies that he did anything for the purpose of cheating or defrauding the complainant, but admits that he purchased the property from the defendant through his agents, Devine & Wootten, and declares that he had no notice of any agreement by complainant with Mrs. Brennan for the purchase of the premises, and says that his own effort to secure the same was in good faith, without any notice of any equity of the complainant in that matter. He further denies that he ever saw any contract which was entered into between the complainant and Mrs. Brennan.

By the evidence submitted at the hearing it appears that on the 4th of July, 1895, Giltinan prepared a paper authorizing him to sell the premises in question as Mrs. Brennan's agent. This authority is in these words:

Kelly *v.* Brennan.

"July 4, 1895.

"I hereby authorize David Giltinan as my agent to sell, *subject to my approval*, the lands owned by me on California, Pacific, Atlantic and Iowa Avenues, in Atlantic City, New Jersey, his commission on sale being two per cent.

"Witness

"Mary A. Brennan.                                    MARY S. BRENNAN."

The defendant Brennan signed this paper, and, under the authority thereby given, Giltinan solicited purchasers for the property and entered into conference with Samuel H. Kelly, the husband of the complainant, for the sale of the premises. Shortly after this paper had been given—some time about the middle of July—Mrs. Brennan sent her attorney, Mr. Ferris, to Mr. Giltinan, who stated to Giltinan (as Giltinan swears) that Mrs. Brennan had been annoyed by parties in Atlantic City "as to the danger that she was in by Giltinan having full power of attorney to do as he pleased with her property; that he [her attorney] wished, as her counsel, to look over the papers." Giltinan says that he found the paper, gave it to Mrs. Brennan's attorney, and he then inserted the words "subject to my approval," now found therein, which I have underscored in the above copy, and Giltinan further says that he then told the attorney that he "wanted nothing unless it was approved."

Mr. Giltinan says that the attorney brought the paper back and called his attention to the words "subject to my approval." Some time afterwards (shown by the testimony of Mr. Ferris to have been on the 10th of August, 1895), Mr. Giltinan says that Mr. Ferris again applied to him for the paper of authorization, stating that the lady was subjected to the same annoyance by persons who were trying to get the property away from him (Giltinan), and took the paper away, and Giltinan never saw it afterwards. He says the attorney told him nothing in regard to any change of sentiments or instructions.

Mr. Ferris (Mrs. Brennan's attorney) swears that when he took away the power of attorney, on the 10th day of August, 1895, he told Mr. Giltinan that Mrs. Brennan had withdrawn her property from the market and had desired him, Ferris, to obtain the paper which he had given to Giltinan, and also

Kelly v. Brennan.

his bill; that Giltinan said he would let him have it the next day, which he did, and said he had no bill. Mr. Giltinan says that the statement of withdrawal did not include the premises on the corner of California and Pacific avenues, which are now in question, but Mr. Ferris denies this, and says that he did not except the corner-piece at California and Pacific avenues. He says that he told Giltinan that Mrs. Brennan had made an absolute withdrawal, but that he supposed that if she got her price she would sell it; but this, he says, was given as his opinion and not by her direction. Mrs. Brennan testifies that, after the return of the paper, she did not give Mr. Giltinan any authority to sell the property.

Mr. Giltinan continued to receive offers for the premises, and finally, on the afternoon of November 23d, 1895, on his return from Philadelphia by the train leaving that city at two P. M., he accepted one made by Kelly at $20,000, and received $250 cash, and at his office in Atlantic City gave him the receipt above set forth, and on the same day, November 23d, wrote to Mrs. Brennan that he had succeeded in getting Kelly to give $20,000 for the property, $5,000 cash and $15,000 on mortgage, "the settlement to be made within thirty days, if you approve. This is the highest price you mentioned to me that you would take. He has paid $250 on account," and he stated that "the reason of accepting of this amount was as he [Kelly] was leaving here to go to Michigan on the early train on Monday, to remain three weeks." Mrs. Brennan, in reply, under date of November 26th, wrote to Giltinan that

"the lot is sold, money paid on the agreement before Mr. Kelly thought of it. I think you have forgotten August 12/95 that I withdrew those lots from the market. I think that if any business was to be transacted I should have been acquainted with it."

The testimony of Godfrey and Kelly shows that they went to Mrs. Brennan to make a tender of the balance of cash and a mortgage, and to request her to make a deed to Mrs. Kelly in accordance with Giltinan's receipt. Whether a formal tender was made is disputed, but there is no dispute that Mrs. Brennan

told them she had already sold the property to Dr. Crosby; that she had no business relations with Mrs. Kelly and referred them to her attorney.

The transactions of the defendant Crosby were carried on directly with Mrs. Brennan herself by Mr. Devine, the attorney for Crosby. Mr. Devine testifies that he had advised Crosby to purchase the tract of land in question; that the matter had been in conversation between him and Crosby for some ten days or two weeks prior to the time when he purchased; that he, Devine, called upon Mrs. Brennan, in Philadelphia, and made her an offer for the property, and also for other property, and asked for an option, which Mrs. Brennan refused to give in writing, but said she would give the refusal of it, that is, she would not sell the land for any price without advising with Mr. Devine. In the conversation between them the property now in question was referred to as the Pacific avenue end, and the figure named as the price for that portion was $20,000.

When Devine reported this conversation to Crosby, he authorized him to purchase the Pacific end at the price named. Mr. Devine had further conference with Mrs. Brennan in Philadelphia on one or two occasions, seeking to get her to accept a lower price for the property than $20,000.

On Saturday, the 23d of November, 1895, Mr. Devine called at her office and again sought to purchase the property at a less price, which Mrs. Brennan refused to accept; at half-past one in the afternoon of that day he again saw Mrs. Brennan at her Philadelphia office and agreed to pay her price. He gave her a check for $500, which he had taken with him for the purpose, on account of the purchase-money, and took her receipt set out in her answer. On the same day, after this transaction was concluded, the witness, Devine, saw Mr. Giltinan on the ferry-boat crossing to Camden.

Mr. Giltinan, in his testimony, states that he saw Mr. Devine on the boat, and came over on the same boat with him to Camden, and that he left Philadelphia on the two o'clock train for Atlantic City; that Kelly was waiting for him. They went to Giltinan's office in Atlantic City shortly after the arrival of

the train, and Giltinan then and there gave to Kelly the receipt which the complainant claims is her contract for the purchase of this lot.

Devine, who made the final bargain for Crosby with Mrs. Brennan, and paid her the $500 on account of the purchase-money, swears it was done on Saturday, November 23d, 1895, about half-past one, in time for him to take the two o'clock afternoon train for Atlantic City, and that after he had made the payment and consummated the deal, he saw Giltinan on the ferry-boat going over to Camden. Devine returned to Atlantic City on Saturday and showed the receipt to Crosby, who was not satisfied with the fullness of it. The more elaborate contract of Mrs. Brennan with Crosby, above set forth, was then drawn up and Crosby signed it on Saturday evening, November 23d, and the next day, Sunday, Devine heard from Crosby that Kelly also claimed to have purchased the lot on Saturday. Devine then went to Philadelphia on Sunday afternoon, and, taking the supplemental contract with him, obtained Mrs. Brennan to execute it on Monday morning, November 25th, 1895, at about eight o'clock.

Mrs. Brennan testified that when Devine, Crosby's agent, made his offers, there was no one else in negotiation for the purchase of the property, not for a month before that time, and that the receipt memorandum was made and signed and the $500 hurriedly paid in order to enable him, Mr. Devine, to catch the train on the 23d of November, 1895, and that the more formal contract of the same date (*Exhibit C 5*) was actually signed on the following Monday, November 25th, and that both were made before any word had been received by her from Giltinan about the sale, that she had at that time no other offer pending for the property, and that she considered that when Devine gave her the $500 that was the sale, and bound her. This was on Saturday, November 23d, 1895, when the informal receipt was given to Devine in Philadelphia, and before Giltinan had returned to Atlantic City on the same day, and necessarily before he met Kelly at the station in Atlantic City, and went to his office with him, and there gave Kelly his receipt.

*Mr. Carlton Godfrey, Mr. Burrows C. Godfrey* and *Mr. Howard Carrow*, for the complainant.

*Mr. Clarence L. Cole* and *Mr. Thomas E. French*, for the defendants.

GREY, V. C.

There are two questions of fact in this case on which the several parties are at variance, the settlement of which will determine their rights. The complainant asserts that she became the equitable purchaser of the lot in question, by a memorandum of sale obtained from Mr. Giltinan, the authorized agent of the defendant Mrs. Brennan. She also alleges that the defendant Crosby knew she had obtained this contract, and, in order to cheat her of her bargain, afterwards entered into a subsequent contract with Mrs. Brennan herself. The complainant prays that the specific performance of her contract obtained through the agent may be decreed.

As to the first point, the dispute turns upon the assertion on the part of the complainant of Mr. Giltinan's authority to bind Mrs. Brennan by a contract of sale, and a denial by the defendant Mrs. Brennan that he had any such power. The original employment of Mr. Giltinan was in writing, and made him Mrs. Brennan's agent to sell the property, fixing his commission. She subsequently, as Mr. Giltinan testifies, became disquieted (whether reasonably or not is of no consequence) and caused the words "subject to my approval" to be inserted in the written memorandum employing him. Mr. Ferris, Mrs. Brennan's attorney, who attended to this change, says it was done about the middle of July. Shortly after this, about the middle of August, she, by her attorney, withdrew this paper altogether from Mr. Giltinan. Mr. Giltinan continued to receive offers and to discuss the sale of the property with Mrs. Brennan for some time after the withdrawal, reporting offers, which were not accepted. But if it be assumed that Mrs. Brennan allowed Mr. Giltinan to retain any authority to sell, the real question on this branch of the case is, what was the character of that authority at the

time he contracted with Kelly ?  That it was originally in writing and unlimited all agree.  That it was modified is also undisputed. The reason for the insertion of the words " subject to my approval " was stated by Mr. Giltinan himself to be the annoyance which Mrs. Brennan suffered because of the representations of parties in Atlantic City " as to the danger she was in by my having full power of attorney to do as I pleased with her property."  This makes it obvious that Mrs. Brennan was unwilling to allow Mr. Giltinan an absolute power to make a sale of her lands, and that the limitation requiring her approval was necessary to satisfy her mind.  By the change this written authority was so restrained that if Mr. Giltinan undertook to sell as Mrs. Brennan's agent he was thereafter obliged to subject his action to her approval.  After this, he testified, that the same reasons led to the second call of Mr. Ferris (Mrs. Brennan's attorney), when the latter took away the paper, now one of limited authority only.  Mrs. Brennan is thus shown to have been unwilling that Mr. Giltinan should exercise the authority of an agent, even subject to her approval.  Mr. Giltinan claims that the taking away of the paper authority was a withdrawal only of the Atlantic and Iowa avenue lot, and not of the California and Pacific avenue lot, now in question.  But the paper, as charged by Mrs. Brennan, authorized him to sell both these tracts subject to Mrs. Brennan's approval, one no more and no less than the other. When it was taken away by Mr. Ferris (Mrs. Brennan's representative), Mr. Giltinan testifies that Ferris " made no comments and no remarks, and told me nothing in regard to any change of sentiments or instructions."  I think it must be taken that the withdrawal of this paper, which Mr. Giltinan defines in its original form to have been a full power of attorney, made an end of Mr. Giltinan's authority to sell any of the land described in it.  The demand by the principal for the absolute delivery of her letter of attorney, and its surrender by the agent, must be held to be a revocation.  But even if this taking away of the written authority is held not to have removed the California and Pacific avenue lot from Mr. Giltinan's control, whatever power he retained under it must certainly have been subject to her approval under the previous modification.

Mr. Giltinan, however, says that he afterwards had several interviews with Mrs. Brennan, the last in October, 1895. At this interview he testifies Mrs. Brennan told him she had withdrawn the Atlantic avenue lots from the market for the present; that she preferred selling the place now in dispute, and she would take $20,000 for it, and told him to sell it if he could get $20,000. This is the same price she had named to him about July 1st, 1895, when Mr. Doyle introduced him to her. Without admitting the full revocation of his previous power, it is under this latter verbal authority that Mr. Giltinan claims he acted for Mrs. Brennan when he sold to Kelly. Mrs. Brennan was asked:

"*Q.* After the return of that paper, what authority, if any, did you give Mr. Giltinan to sell this property?

"*A.* Not any."

She further says on cross-examination:

"I told Mr. Giltinan that I wanted $20,000, but I didn't recognize Mr. Giltinan as agent after I withdrew that; I said I wanted $20,000, but I did not say he must get it any more than anyone else."

It is to be observed that Mrs. Brennan and Mr. Giltinan appear to be in direct contradiction each of the other. He claims that her direction to him created an unlimited power to bind her by written contract for sale whenever he could get $20,000 for the property. She declares that all she said to him was that her price was $20,000, but she did not give Giltinan any authority to sell, nor recognize him as her agent to bind her to a sale after she withdrew the written appointment. The complainant offered several persons who had conversations with Mrs. Brennan, some of them after the middle of August, when the written authority was withdrawn, who testified that Mrs. Brennan described Mr. Giltinan as her agent, and Mr. Kelly testified that she made substantially the same statement to him in October, 1895. None of these statements imputed to Mrs. Brennan were of a specific character, to define the nature and extent of the authority which Mr. Giltinan might have to act for Mrs. Brennan.

The claim of the complainant is that they amount to an admission by Mrs. Brennan that Giltinan was her agent with power to bind her by a contract for sale. Mrs. Brennan's declaration is that after she withdrew the written authority Mr. Giltinan had no other right to represent her than the other person had who knew her price and brought her a purchaser. The witnesses who most accurately know what authority Mr. Giltinan had from Mrs. Brennan were of course these two persons themselves. It is, in my view, undisputed that Mrs. Brennan, in the summer of 1895, withdrew a written power which did confer upon Mr. Giltinan precisely the authority to act for her which, it is now asserted, she renewed by parol. It is also clearly shown that she took this power away, because she was unwilling that Mr. Giltinan should be able to dispose of her property, even subject to her approval. No reason is given why this deliberate act of Mrs. Brennan, done through her legal adviser, should have been nullified by herself unadvised, and the power renewed by parol without any limitation whatever. By a letter from Mrs. Brennan to Giltinan, dated August 31st, 1895, she writes in reply to a letter from him, " I will not listen to an offer of that kind, only what I said." In another, dated October 15th, 1895, she writes, evidently in reply :

"The other lot, from Atlantic to Pacific, I do not care to sell at present, I prefer to sell from Pacific to Monterey on California ave., if I get what I ask at present, if not, I will wait or divide off in lots."

This is not the correspondence of a principal with an agent who is informed of the principal's price and purpose, with power to bind her to a sale, but is evidently a letter of information to an inquirer who is seeking to find out whether an owner will sell, and if so, what lands. Evidently Mrs. Brennan believed that her approval was yet necessary to enable a sale to be made. Mr. Giltinan's letter to Mrs. Brennan, written November 23d, 1895, immediately that he had given the memorandum of sale to Mr. Kelly, shows that at that time he stated the matter to Mrs. Brennan as if his action were still subject to her approval. He writes :

"I have succeeded in getting Mr. Kelly to give $20,000 for the piece of land owned by you on Pacific avenue to Monterey, $5,000 cash and $15,000 on mortgage at 6 per cent., payable in one or three years, the settlement to be made within thirty days if you approve."

He immediately explains that this was the highest price she had named, that Kelly had paid $250, and that the reason he accepted this was that Kelly was about. to go away for several weeks. Thus in the very letter in which he announces to Mrs. Brennan the sale to Kelly, he submits the matter to her approval and excuses himself for taking a cash payment because of Kelly's intended sudden departure. This is the first letter written by Mr. Giltinan to Mrs. Brennan which in any way assumes to act for her in any capacity regarding the sale of the lot. At once, on receipt of it, Mrs. Brennan wrote him in reply :

"Respecting the lot in Atlantic City, the lot is sold; money paid on the agreement before Mr. Kelly thought of it. I think you have forgotten Aug. 12/95, that I withdrew these lots from the market. I think that if any business was to be transacted I should have been acquainted with it "

Mr. Giltinan was recalled to the stand after all these proofs were in. He was again examined in relation to the insertion by Mr. Ferris, in July, 1895, of the words "subject to my approval," in the written power. He testified that on that occasion, speaking to Mr. Ferris regarding the interpolation of these words, "I told. him I wanted nothing unless it was approved."

Although there is some contradiction in the evidence, I think the weight of it goes to show that if Mr. Giltinan, on November 23d, 1895, when he gave Kelly his memorandum of sale, had any authority from Mrs. Brennan to act as her agent, it was only subject to her approval, which his sale to Kelly never received, as she disapproved it at once on notice of it.

Upon the second point, as to the priority of the agreements, the complainant claims that her memorandum of sale was first made and obtained, and that Crosby's was afterwards procured to cheat her of her bargain. The evidence shows that Crosby's agreement was obtained by a negotiation made directly with

Mrs. Brennan in person, at her Philadelphia office, by Mr. Devine, Mr. Crosby's agent, at half-past one o'clock in the afternoon of November 23d, 1895 ; that at that time Mr. Giltinan, through whose alleged agency complainant claims her contract, was in Philadelphia, whence he returned that afternoon by the two o'clock train to Atlantic City, where, on the arrival of the train, he met the husband of the complainant, Kelly, and at half-past three in the afternoon gave him the receipt and accepted the $250, which constitute the evidence of the complainant's claim. There is no dispute between the parties as to the order of time in which the events narrated happened. Irrespective of questions as to the existence or extent of Mr. Giltinan's authority to act as agent of Mrs. Brennan in the premises, and to bind her without her previous approval, by a contract to sell, it appears that Mrs. Brennan had herself entered into a contract with Crosby to sell him the property, and had accepted $500 payment on account of the purchase-money before Giltinan, acting as her agent, had made any agreement whatever with Mr. Kelly, or had even heard from him that he was willing to pay the full price. The letters and telegrams and checks produced support the statement that the sale by Mrs. Brennan to Crosby's agent preceded the sale by Giltinan to Kelly beyond any doubt whatever..

When Mrs. Brennan, the principal, contracted with Crosby, that act, of itself, stripped her agent, if she had one, of all power to make another contract in derogation of that entered into by his principal. The agent could have no greater authority than the principal, and the latter having disposed of the subject-matter of the agency, the power of the agent to act any further in the premises was at once ended. When Giltinan, as agent for Mrs. Brennan, undertook to deal with Kelly, the lot had already been sold by Mrs. Brennan, and partly paid for, and consequently this later transaction was of no force.

The complainant's charge against the defendant Crosby is that he, knowing of the complainant's previous purchase, entered into a pretended contract on the following day to buy the property from Mrs. Brennan, and her prayer is that her contract with

Mrs. Brennan, obtained as set out in the bill from Mr. Giltinan, may be specifically enforced by a conveyance &c., upon payment of price &c., mortgage made &c.

Crosby denies this charge by his answer, and sets up his own agreement made with Mrs. Brennan by his agent, Devine, as prior in point of time and without notice of any agreement of complainant.

The issue presented between these parties is then simply and only whether Crosby, after complainant had obtained her agreement, and having knowledge of this fact, secured another from Mrs. Brennan in favor of himself. The complainant thus bases her whole complaint against Crosby solely upon her alleged priority in securing her own contract.

The review of the evidence above given shows that the agreement which Devine, Crosby's agent, procured for him in Philadelphia, was, in fact, made before the contract between Kelly and Mr. Giltinan in Atlantic City, though on the same day. The supplemental and fuller agreement with Crosby was signed by him on the same day in Atlantic City, and perfected on the following Monday in Philadelphia by Mrs. Brennan. It is also shown that the Kelly contract, by reason of the lack of authority of Mr. Giltinan at the time of making it to bind Mrs. Brennan, is of no force to enable the complainant to maintain her bill and entitle her to the relief she asks, against either defendant.

I will advise a decree dismissing the complainant's bill, with costs.